### THE AUTHENTIC.

### THE TRANSFER NO. 5.

District Court, S. D. New York. August 31, 1929.

Duncan & Mount, of New York City (Charles R. Millett, of New York City, of counsel), for Bush Terminal Co.

Park, Mattison & Lynch, of New York City (Anthony V. Lynch, Jr., of New York City, of counsel), for the Authentic.

Macklin, Brown, Lenahan & Speer, of New York City (G. J. McKernan, of New York City, of counsel), for Goodwin Gallagher Sand & Gravel Co.

WOOLSEY, District Judge. My decision in this case is that both the Authentic and the Transfer No. 5 are to blame for the collision between car float No. 32 and sand scow GG–70, which is the subject-matter of the first libel. Consequently the costs and damages are to be divided.

It follows that the Goodwin Gallagher Sand & Gravel Company, owner of the sand scow GG–70 is entitled to recover under the second libel against each of the said tugs any damages it may have suffered, and to have its costs. Any payment by either tug to the Goodwin Gallagher Sand & Gravel Company is to be adjusted between the tugs as part of the collision damages.

The two cases are to be consolidated by order to be entered before the interlocutory decree.

■ The collision herein involved happened May 13, 1926, at 8:15 o'clock p. m. daylight saving time.

It was late twilight on a clear evening. The visibility was good. The tide was at the start of the flood and was running north about 2 miles per hour. There was a brisk southwesterly wind estimated at about 35 miles per hour.

The Transfer No. 5 bound for Bush Terminal, having picked up the steel car float No. 42 at the West Shore Piers in Weehawken, and the wooden car float No. 32 at the Erie Railroad Piers just above the Pavonia Ferry Slips, started down the North River from the latter place with the No. 42 on her starboard and the No. 32 on her port side.

The tug was between the after ends of the two car floats, one of which was loaded with coal cars and the other with box cars. The bows of the two floats were only about 15 or 20 feet apart.

Regulation lights were burning on the tug, and there were lights on the outboard corners of the floats.

There was not any lookout posted forward on either float. There was no one charged with the duty of lookout on the Transfer No. 5, although the position of that tug between the car floats was such that it is doubtful whether any lookout on her would have been of use.

The Transfer No. 5 and her flotilla, therefore, was proceeding without navigational eyes through crowded waters.

I find the Transfer No. 5 in fault for not having a lookout, a fact which was, almost admittedly, a contributing cause to the collision.

Whilst the Transfer No. 5 was coming down about 600 feet off the docks, and when she was about opposite the Lehigh Valley Terminal, she starboarded her helm to pass behind a New Haven tug, with two floats, which was coming across from New Jersey to the Lehigh Valley Terminal. After the Transfer No. 5 passed the New Haven tow she first observed the tug Authentic with a tow of three sand scows bearing about two points on her starboard bow and only a short distance away. The Authentic was heading apparently about northeast at an angle of about 45 degrees across the Hudson River.

She then heard a one blast signal from the Authentic, which she immediately answered and put her wheel to port.

Counsel for the Authentic did not call any witnesses from on board her. He rested after calling the captain of a ferryboat of the Central Railroad of New Jersey, who made a poor impression on me and whose attempt to satisfy me that the Authentic's tow was following straight behind her, as she headed up and across the river, has wholly failed.

■ The failure to call any of the Authentic's navigators—most unusual in a collision case—necessitates the presumption that their evidence would not have been favorable to her.

■ The collision happened a little above the line between the Upper Bay and the North River about eight or nine hundred feet off the Communipaw Docks of the Central Railroad of New Jersey and between it and Battery Place on the New York shore.

Apparently, therefore, the narrow channel rule would not apply and the Authentic cannot be condemned for going up on the New Jersey side of the river.

■ This was a crossing case. The Transfer No. 5 was showing her green light to the Authentic's red light, and it was the duty of the Transfer No. 5 to keep clear, and, after their exchange of single blast signals, to pass to the stern of the Authentic's tow. She might have succeeded in doing this, in spite of the failure to keep a good lookout, if it had not been for the fact that the Authentic's tow, under the influence of the following tide and wind, and owing to the fact that the Authentic apparently did not have power enough to keep it straightened out, was tailing to the westward and up river. This made it impossible for the Transfer No. 5 to clear the tow.

To allow a tow to get into this situation in a crowded part of the river is wrong and is the fault for which I condemn the Authentic. The Wrestler (C. C. A.) 232 F. 448; The Madison (C. C. A.) 250 F. 850.

Accordingly I will sign, first, an order of consolidation and, then, an interlocutory decree in the consolidated case containing the provisions indicated at the beginning of this opinion.